**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION**

| | |
|---|---|
| Fred R. Halcomb, Jr., ) | |
| ) | Civil Action No.: 8:17-cv-01410-JMC |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER AND OPINION** |
| ) | |
| Inmate Classification Committee ) | |
| Chairperson Mrs. Ravenal, in her individual ) | |
| capacity, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court for review of the Magistrate Judge's July 11, 2018 Report and Recommendation ("Report") (ECF No. 51), recommending the court grant Defendant Inmate Classification Committee Chairperson Mrs. Ravenal's ("Defendant") Motion for Summary Judgment (ECF No. 22). For the reasons below, the court **REJECTS** the Magistrate Judge's Report (ECF No. 51) and **DENIES** Defendant's Motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Report sets forth the relevant facts, which this court adopts without a full recitation. (ECF No. 51 at 2-4.) As brief background, during the time relevant to this action, Plaintiff was an inmate at Lieber Correctional Institution ("Lieber") in Ridgeville, South Carolina.[1] (ECF No. 51 at 2.) On September 1, 2005, Plaintiff was convicted of murder and sentenced to life without the

---

[1] Plaintiff has not been incarcerated at Lieber since October 2017. (ECF No. 17.) Since October 2017, Plaintiff has been incarcerated at Statesville Correctional Center in Crest Hill, Illinois (*Id.*), the Kirkland Correctional Institution in Columbia, South Carolina (ECF No. 30), and the Pontiac Correctional Center in Pontiac, Illinois, which is Plaintiff's current confinement location according to a December 4, 2017 letter from Plaintiff notifying the court he had been transferred to Pontiac (ECF No. 33).

1

possibility of parole. (*Id.*) On March 23, 2016, as a result of several disciplinary violations, Plaintiff was transferred from general population into the Restricted Housing Unit on Short Term Detention Status to await a hearing before the Disciplinary Hearing Officer. (*Id.* at 2-3.) On April 14, 2016, Plaintiff was convicted of the March 23 violations and sanctioned to sixty days (60) in disciplinary detention. (*Id.* at 3.) On April 18, 2016, the RHU Institutional Classification Committee ("ICC"), which consisted of Defendant and two other members, reviewed the classification of inmates on disciplinary detention to determine whether they should be transferred to security detention. (*Id.*; ECF No. 22 at 4.) Plaintiff's hearing before the ICC took place on April 18, 2016. (*Id.*) Plaintiff claims he did not receive forty-eight hours notice of this hearing, as mandated by South Carolina Department of Corrections ("SCDC") policy, and did not know about the hearing until he arrived at the hearing. (*Id.*; ECF No. 1 at 5-6.) At the conclusion of the hearing, after considering Plaintiff's testimony, disciplinary record, and institutional history, the ICC recommended to Central Classification that Plaintiff be placed in security detention. (ECF No. 51 at 3.) Central Classification adopted the ICC's recommendation and placed Plaintiff in security detention on April 20, 2016. (*Id.*) After unsuccessfully appealing his placement in security detention by filing both Step 1 and Step 2 grievances, Plaintiff, proceeding pro se, commenced the present action. (*Id.*) Plaintiff alleges Defendant violated his due process rights under the Fourteenth Amendment by failing to provide him notice of the ICC hearing. (ECF No. 1 at 5.)

On September 8, 2017, Defendant filed her Answer (ECF No. 14) to Plaintiff's Complaint. On October 10, 2017, Plaintiff replied to Defendant's Answer. (ECF No. 21.) On October 20, 2017, Defendant moved for summary judgment. (ECF No. 22.) The Magistrate Judge entered an order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the

summary judgment procedure and possible consequences if he failed to adequately respond. (ECF No. 24.) On January 16, 2018, Plaintiff filed his Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 39) to which Defendant replied on January 26, 2018 (ECF No. 45). On February 20, 2018, Plaintiff filed a Sur Reply. (ECF No. 49.) On July 11, 2018, the Magistrate Judge issued her Report recommending the court grant Defendant's Motion. (ECF No. 51.) On August 31, 2018, Plaintiff filed an Objection to the Magistrate Judge's Report. (ECF No. 58.) On September 12, 2018, Defendant filed a reply. (ECF No. 61.)

## II. LEGAL STANDARD

The Magistrate Judge's Report is made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2)(c) for the District of South Carolina. The Magistrate Judge makes only a recommendation to the court, which has no presumptive weight. The responsibility to make a final determination remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections are filed and reviews those portions which are not objected to—including those portions to which only "general and conclusory" objections have been made—for clear error. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005); *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983); *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). As Plaintiff is a pro se litigant, the court is required to liberally construe his arguments. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. *See* 28 U.S.C. § 636(b)(1).

Summary judgment is a drastic remedy and "should not be granted unless it is perfectly clear that there are no genuine issues of material fact in the case." *Ballinger v. N.C. Agr. Extension*

*Serv.*, 815 F.2d 1001, 1004–05 (4th Cir. 1987). *See also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds a reasonable jury could return a verdict for the non-moving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

When ruling on a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). The non-moving party may not oppose a summary judgment motion with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required to survive summary judgment is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

### III. DISCUSSION

The Fourteenth Amendment protects persons against deprivation of life, liberty, or property without due process of law. U.S. Const. amend. XIV. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation

4

of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). "The Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions, entitling him to procedural Due Process protections." *Prieto*, 780 F.3d at 248. *See also Wilkinson*, 545 U.S. at 222 ("We have also held, however, that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Cooner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L.Ed.2d 418 (1995)."). To demonstrate a prisoner has such an interest, and invoke the procedural protections of the Fourteenth Amendment Due Process Clause, the prisoner must show (1) denial of "an interest that can arise either from the Constitution itself or from state laws or policies,"[2] and that (2) this denial imposed on him an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (quoting *Sandin*, 515 U.S. at 484). The second prong of this test is "necessarily [a] fact-specific" inquiry. *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997). "But, the ultimate determination of whether the conditions impose such an atypical and significant hardship that a liberty interest exists is a legal determination, subject to de novo review." *Id.*

The United States Court of Appeals for the Fourth Circuit has held that "general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison

---

[2] Defendant concedes this prong, as she does not argue it; neither does the Magistrate Judge's Report address it. (*See* ECF No. 22 at 8 ("Though Plaintiff himself triggered the [security detention] review by violating SCDC's disciplinary policies and rules against contraband, Defendant does not argue the first prong."); ECF No. 51 at 8–10.)

5

population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015), *as amended* (July 7, 2015). "[A] general population inmate's confinement expectations radiate from the conditions that inmates in the general population normally experience." *Id.* at 528.

In *Bevrati v. Smith*, inmates

> complain[ed] of a six-month administrative confinement, claiming that the length of the confinement and the conditions to which they were exposed made the assignment an atypical and significant hardship. . . . [The] Inmates . . . submitted affidavits attesting that the actual conditions in administrative segregation are more onerous than those specified in the prison regulations. They claim that when they were initially placed in segregation, their cells were infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above. And, they assert, they were forced to use their clothing and shampoo to clean the cells. In addition, Inmates maintain that their cells were unbearably hot and that the food they received was cold. Furthermore, [Appellant] Van Aelst submitted an affidavit indicating that those assigned to administrative segregation did not receive clean clothing, linen, or bedding as often as required by the regulations governing administrative segregation; that they were permitted to leave their cells three to four times per week, rather than seven, and that no outside recreation was permitted; that there were no educational or religious services available; and that food was served in considerably smaller portions.

120 F.3d at 504. The Fourth Circuit,

> accepting the Inmates' version of the conditions . . . as we must for purposes of review of the grant of summary judgment . . . conclude[d] that although the conditions were more burdensome than those imposed on the general prison population, they were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life.

*Id.*

Eight years later in *Wilkinson*, "the [United States] Supreme Court further illuminated the atypicality standard." *Incumaa*, 791 F.3d 529. The *Wilkinson* Court found the following conditions imposed an atypical and significant hardship:

> almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 25 hours; exercise is 1 hour per day, but only in a small indoor room. Save perhaps for the

6

> especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at OSP [(Ohio State Penitentiary)] is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration.

*Wilkinson*, 545 U.S. at 224 ("While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.").

In *Incumaa*, the Fourth Circuit Court of Appeals examined *Wilkinson*, and found that, "The [United States Supreme] Court emphasized three factors in its analysis: (1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." 791 F.3d at 530. The Fourth Circuit noted that the *Wilkinson* Court

> did not engage in a point-by-point comparison of the conditions that inmates experienced in a supermax facility with ordinary incidents of prison life. Nor did it determine whether the applicable baseline was the general population or any another segregation unit. Instead, the Court concluded that incarceration in the Supermax environment was so atypical and significant that it would give rise to a liberty interest 'under any plausible baseline.'

*Id.* In *Incumaa*, the Fourth Circuit also made clear that

> *Beverati* does not signal that "the bar for proving an atypical and significant hardship is quite high in the Fourth Circuit." *Incumaa*, 2014 WL 958679 at *9 n. 4. The bar in our circuit is neither higher nor lower than that of the Supreme Court. Rather, *Beverati* simply highlights a failure of proof. The *Beverati* inmates failed to meet their burden because the evidence showed that administrative segregation was not significantly worse than confinement in the general population.

*Id.* at 531.

On the merits, the *Incumaa* court found,

7

> Appellant demonstrated that his confinement conditions were severe. He provided uncontested evidence describing the severely restrictive and socially isolating environment of the SMU [(Special Management Unit)] in contrast to the general population—the near-daily cavity and strip searches; the confinement to a small cell for all sleeping and waking hours, aside from ten hours of activity outside the cell per month; the inability to socialize with other inmates; and the denial of educational, vocational, and therapy programs.
>
> In many respects, the circumstances of Appellant's incarceration in the SMU mirror the experience of the *Wilkinson* inmates in Ohio's Supermax facility. It may, in fact, be worse in some respects: unlike the *Wilkinson* inmates, Appellant is subject to a highly intrusive strip search every time he leaves his cell. And, the *Beverati* inmates did not allege that they were socially isolated to a similar degree.
>
> Second, similar to the *Wilkinson* inmates' confinement in a supermax facility, Appellant's confinement to the SMU is extraordinary in its duration and indefiniteness. The district court relied on an unpublished opinion that stated, "[e]xtended stays on administrative segregation . . . do not ordinarily implicate a protected liberty interest." *United States v. Daniels*, 222 Fed. Appx. 341, 342 n. * (4th Cir. 2007). But *Daniels* has no precedential weight, and it did not consider an exceptional 20–year stint in highly restrictive solitary confinement, as we do here. Furthermore, the district court wrongly concluded that Appellant's stay in the SMU, although not limited to a particular number of days, was not "indefinite" because Appellant could secure release by renouncing his affiliation with the Five Percenters. As we explained above, renunciation does not guarantee release to the general population.
>
> Appellant was already ineligible for parole by virtue of his sentence before he was transferred to the SMU, and therefore his confinement does not implicate the third concern identified in *Wilkinson*. But that fact, in itself, does not undermine the "material and substantial similarities" that this case bears to *Wilkinson*. *Wilkerson*[ *v. Goodwin*,] 774 F.3d [845,] 855 [(5th Cir. 2014)] (finding liberty interest pursuant to *Wilkinson* where inmate was administratively segregated indefinitely in highly restrictive solitary confinement conditions for nearly 39 years, even though segregation did not affect the inmate's parole eligibility).
>
> Therefore, Appellant has demonstrated a liberty interest in avoiding solitary confinement in security detention.

*Id.* at 531–32.

As to the second factor of the *Wilkinson* test—whether the administrative segregation is for an indefinite period—there is significant variance among the federal courts of appeals as to what length of time gives rise to a liberty interest. *See Incumma*, 791 F.3d at 531–32 (twenty

8

years); *Kervin v. Barnes*, 787 F.3d 833, 836–37 (7th Cir. 2015) ("[T]he judge's second error was to suggest, echoing the *Beverati* decision, that a prisoner must spend at least six months in segregation before he can complain about having been deprived of liberty without due process of law. A considerably shorter period of segregation may, depending on the conditions of confinement and on any additional punishments, establish a violation, as held in such cases as *Palmer v. Richards*, 364 F.3d 60, 65–67 (2d Cir. 2004) (77 days); *Mitchell v. Horn*, 318 F.3d 523, 527, 532–33 (3d Cir. 2003) (90 days); and *Gaines v. Stenseng*, 292 F.3d 1222, 1225–26 (10th Cir. 2002) (75 days). Six months is not an apt presumptive minimum for establishing a violation. Judges who lean toward such a presumption may be unfamiliar with the nature of modern prison segregation and the psychological damage that it can inflict."); *Wilkerson*, 774 F.3d at 855 (thirty-nine years); *Davis v. Barrett*, 576 F.3d 129, 135 (2d Cir. 2009) ("Even though Davis's confinement was relatively short—lasting at most 55 days—this [c]ourt has required a 'detailed factual record,' unless 'the period of time spent in SHU was exceedingly short—less than [ ] 30 days. . .—and there [is] no indication that the plaintiff endured unusual SHU conditions.' *See Palmer*, 364 F.3d at 65–66."); *Harden-Bey v. Rutter*, 524 F.3d 789 (6th Cir. 2008) (three years); *Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008) (finding twelve months of administrative segregation was not atypical or a significant hardship); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (eight years); *Wilkerson*, 774 F.3d at 855 ("[T]he duration in segregated confinement that courts have found does not give rise to a liberty interest ranges up to two and one-half years . . . ."); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) ("[E]xposure to the conditions of administrative custody for periods as long as 15 months 'falls within the expected parameters of the sentence imposed [on him] by a court of law.'").

As to the first factor of the *Wilkinson* test, the Magistrate Judge found that

> unlike the inmates in *Bevrati*, Plaintiff has provided a detailed and specific declaration detailing the differences between general population and [security detention] Level 2. Nevertheless, the undersigned finds that Plaintiff has failed to establish a significant change in conditions as a result of his transfer to [security detention]. As an initial matter, as recognized by Plaintiff, some of his restrictions would apply even if he were on general population because of his disciplinary record. [*See* Doc. 39-1 at 23 ¶ 33 (Plaintiff averring that on general population he would be eligible for a job assignment, but due to the escape charge on his disciplinary record, his job opportunities would be limited), 24 ¶ 34 (Plaintiff averring that even if located on general population he would have trouble accessing outside medical treatment because of his disciplinary record).] As such, although Plaintiff's restrictions were more burdensome than inmates in general population, the undersigned finds that Plaintiff has not established that the restrictions were significant in magnitude.

(ECF No. 51 at 16.) Plaintiff specifically objected to this finding (ECF No. 58 at 4-13); therefore, the court reviews this portion of the Magistrate Judge's Report de novo. *See Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47.

First, as the Magistrate Judge recognized, Plaintiff provided a detailed and specific declaration detailing the difference between general population and [security detention]. (ECF No. 39-1 at 5-25.) Many of the confinement conditions Plaintiff identified both the United States Supreme Court and the Fourth Circuit Court of Appeals have found relevant in determining whether confinement conditions impose an atypical and significant hardship. For example, in *Wilkinson*, the United States Supreme Court found "almost all human contact [wa]s prohibited [and] exercise is 1 hour per day but only in a small indoor room." *Wilkinson*, 545 U.S. at 224. Here, "Plaintiff is confined to his cell for twenty-three hours per day—when he is given recreation time. . . . On Saturdays and Sundays, Plaintiff is confined to his cell for twenty-four hours." (ECF No. 51 at 14.) Plaintiff receives sixty to ninety minutes of recreation five days per week "in a small cage." (*Id.* at 12.) Also, "Plaintiff is only allowed visits from his attorney, and they are held behind glass. . . . Plaintiff is allowed no general visitation," neither is he "allowed to receive personal telephone calls." (*Id.* at 13.) *See Wilkinson*, 545 U.S. at 214 ("Opportunities for visitation

10

are rare and in all events are conducted through glass walls."). Furthermore, in *Incumaa*, the Fourth Circuit Court of Appeals found that, "the circumstances of Appellant's incarceration . . . . may . . . be worse in some respects [than the *Wilkinson* inmates because] Appellant is subject to a highly intrusive strip search every time he leaves his cell." *Incumaa*, 791 F.3d at 531. Like the Appellants in *Incumaa*, Plaintiff is also subject to a highly intrusive strip search before entering and exiting his cell. (ECF Nos. 51 at 12–13; 58 at 7.) The Magistrate Judge did not mention these confinement conditions in her analysis. Instead, the Magistrate Judge noted that "some of the restrictions[, as recognized by Plaintiff,] would apply even if he were on general population because of his disciplinary record." (ECF No. 51 at 16.) However, the confinement conditions the United States Supreme Court and the Fourth Circuit Court of Appeals found germane to the determination of atypicality in *Wilkinson* and *Incumaa*—the amount of human contact, the amount of time an inmate is let out of his cell, and the subjection to intrusive strip searches—would not apply if Plaintiff were on general population. (ECF No. 51 at 12–13.) Accordingly, the court finds "the circumstances of Plaintiff's incarceration in [security detention] mirror the experience of the *Wilkinson* [and *Incumaa*] inmates." *Incumaa*, 791 F.3d at 531.

The court turns now to the second factor of the *Wilkinson* test: the duration and indefiniteness of Plaintiff's confinement in security detention. The Magistrate Judge found, "Plaintiff has failed to set forth a duration of the infinite nature that implicates due process concerns because his custody status was reviewed every ninety days, and he was eligible for release after twelve months on [security detention]." (ECF No. 51 at 18.) Accepting Plaintiff's allegations as true, as the court must in its review of a summary judgment motion, Plaintiff was required to serve at least twelve months in SD before any review of his placement. (*Id.*) The court recognizes this period of confinement is far shorter than the duration of time the Appellant in *Incumma* spent in

11

administrative segregation. *Incumaa*, 791 F.3d at 531 (twenty years). But, as previously indicated, some courts have found administrative confinement periods shorter than twelve months to be atypical and a significant hardship. *See Kervin*, 787 F.3d at 836–37 ("[T]he judge's second error was to suggest, echoing the *Beverati* decision, that a prisoner must spend at least six months in segregation before he can complain about having been deprived of liberty without due process of law. A considerably shorter period of segregation may, depending on the conditions of confinement and on any additional punishments, establish a violation, as held in such cases as *Palmer v. Richards*, 364 F.3d 60, 65–67 (2d Cir. 2004) (77 days); *Mitchell v. Horn*, 318 F.3d 523, 527, 532–33 (3d Cir. 2003) (90 days); and *Gaines v. Stenseng*, 292 F.3d 1222, 1225–26 (10th Cir. 2002) (75 days). Six months is not an apt presumptive minimum for establishing a violation. Judges who lean toward such a presumption may be unfamiliar with the nature of modern prison segregation and the psychological damage that it can inflict."); *Davis*, 576 F.3d at 135 ("Even though Davis's confinement was relatively short—lasting at most 55 days—this [c]ourt has required a 'detailed factual record,' unless 'the period of time spent in SHU was exceedingly short—less than [ ] 30 days . . .—and there [is] no indication that the plaintiff endured unusual SHU conditions.' *See Palmer*, 364 F.3d at 65–66.")

More importantly, in both *Wilkinson* and *Incumaa*, the United States Supreme Court and the Fourth Circuit Court of Appeals focused not just on how long the inmate had actually been in administrative segregation, but the indefinite nature of the placement. *See Wilkinson*, 545 U.S. at 224 ("Unlike the 30-day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually."); *Incumaa*, 791 F.3d at 531 ("Furthermore, the district court wrongly concluded that Appellant's stay in the SMU, although not limited to a particular number of days, was not 'indefinite' because Appellant could secure release by renouncing his

affiliation with the Five Percenters. As we explained above, *renunciation does not guarantee release to the general population*." (emphasis added)). In fact, in *Wilkinson*, the United States Supreme Court did not mention the amount of time the Petitioner inmates actually spent in administrative segregation. *See Wilkinson*, 545 U.S. at 218. Accordingly, while the duration an inmate actually spends confined in administrative segregation is a significant consideration, it is not dispositive, as the Magistrate Judge found. (*See* ECF No. 51 at 17 ("As an initial matter the [c]ourt notes that evaluating duration involves *only the time Plaintiff would spend in SD—and have the ability to return to general population*—not the amount of time it would take him to return to his prior custody level." (emphasis added)).) Here, Plaintiff had to spend at least twelve months in SD without a review of his placement, compared to the inmates in *Wilkinson* whose placement was reviewed after thirty days. Moreover, while Plaintiff's security detention placement was reviewed every ninety-days by the ICC, this "d[id] not guarantee release to the general population," *Incumaa*, 791 F.3d at 531, as the ICC "only makes a recommendation regarding an inmate's placement on SD status – the final decision is made by SCDC Central Classification," (ECF No. 22 at 5). Also, the fact that Plaintiff's security detention placement was reviewed every ninety-days does not, in and of itself, mean the nature of Plaintiff's confinement in security detention was not indefinite. In both *Wilkinson* and *Incumaa*, the administrative detention confinements were reviewed after one year thirty days respectively. *See Wilkinson*, 545 U.S. at 224; *Incumaa*, 791 F.3d at 522. Yet, both the United States Supreme Court and the Fourth Circuit Court of Appeals found the nature of the confinement in those cases was indefinite. *Wilkinson*, 545 U.S. at 224; *Incumaa*, 791 F.3d at 531. Here, Plaintiff's security detention confinement is reviewed every ninety days, a longer review period than that in *Incumaa*; the reviewing body—the ICC—only makes a recommendation; and it is not clear from the record whether these reviews are

"meaningful" or perfunctory. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))). Therefore, the court finds Plaintiff's confinement in security detention is indefinite.

Finally, as to the third factor of the *Wilkinson* test—whether assignment to administrative segregation had any collateral consequences on the inmate's sentence—the Magistrate Judge found, "The [United States] Supreme Court in *Wilkinson*, and the Fourth Circuit in *Incumaa*, have found prison conditions implicate constitutional procedural protection *only* when 'they extinguish[] eligibility for parole and were extremely isolating, of indefinite duration, and without defined criteria for eligibility to transfer to less restrictive conditions.'" (ECF No. 51 at 18 (quoting *Dash v. Sellers*, No. 9:17-1716-JMC-BM, 2017 WL 6034120, at *2 (D.S.C. Nov. 14, 2017)).) However, *Incumaa* does not mandate placement in administrative segregation must extinguish parole eligibility in order to be atypical and a significant hardship. In *Incumaa*, the Fourth Circuit found

> Appellant was already ineligible for parole by virtue of his sentence before he was transferred to the SMU, and therefore his confinement does not implicate the third concern identified in *Wilkinson*. But that fact, in itself, does not undermine the "material and substantial similarities" that this case bears to *Wilkinson*.

*Incumaa*, 791 F.3d at 532. The Appellant in *Incumaa* was "serving a sentence of life imprisonment without the possibility of parole in a prison operated by the South Carolina Department of Corrections," just like Plaintiff. 791 F.3d at 519. Accordingly, as Plaintiff is already ineligible for parole, "his confinement does not implicate the third concern identified in *Wilkinson*. But that fact, in itself, does not undermine the 'material and substantial similarities' that this case bears to *Wilkinson* [and *Incumaa*]." *Id.* at 532.

14

Based on the foregoing, the court finds Plaintiff has offered evidence showing the conditions of confinement in security detention "are significantly worse than in the general population and that the severity, duration, and indefiniteness of his confinement" demonstrate Plaintiff has a liberty interest in avoiding placement in security detention. *Incumaa*, 791 F.3d at 531.

Because the Magistrate Judge found Plaintiff did not have a liberty interest in avoiding placement in security detention, she concluded, "Plaintiff's allegations fail to demonstrate what Defendant violated Plaintiff's constitutional rights. Therefore, Defendant is entitled to qualified immunity." (ECF No. 51 at 21.) However, the court finds there are triable issues of fact as to whether Defendant is entitled to qualified immunity. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" (quoting *Anderson,* 477 U.S., at 249.))

Qualified immunity provides that government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This inquiry is a two-part test: "A court 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the

alleged violation.' "[3] *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).

Because the court finds Plaintiff had a liberty interest in avoiding placement on security detention, he was entitled to procedural Due Process protections. *See Prieto*, 780 F.3d at 248 ("The Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions, entitling him to procedural Due Process protections."). In her Motion for Summary Judgment, Defendant does not dispute that Plaintiff did not receive notice of his security detention hearing before the ICC. (*See* ECF No. 51 at 10–13.) Instead, Defendant argues

> Plaintiff cannot dispute he knew why he was before the [ICC], cannot dispute he was given a meaningful opportunity to be heard by the [ICC], cannot dispute he was provided notice of the [ICC]'s decision and its basis, and cannot dispute he grieved the decision of the [ICC]. Thereafter, the law provides an appellate process of which he did not avail himself. Accordingly, the facts of this case simply do not rise to the level necessary to establish a due process violation.

(*Id.* at 13.) However, viewing the facts in the light most favorable to Plaintiff, the court finds there are triable issues of fact as to whether Defendant's failure to notify Plaintiff of the ICC hearing deprived Plaintiff of an actual constitutional right and whether that right was clearly established. In *Wilkinson*, the United States Supreme Court found that "Ohio's New Policy is adequate to safeguard an inmate's liberty interest in not being assigned to [Ohio's Supermax facility]," pointing out that "[a]t least 48 hours before the hearing, the inmate is provided with written notice summarizing the conduct or offense triggering the review." *Wilkinson*, 545 U.S. at 216. Moreover,

---

[3] The court notes that the Supreme Court does not mandate the order of this two-part inquiry, however, the court chooses to adhere to the order discussed above because "the judges of district courts . . . are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Moreover, the Supreme Court recognizes that the above sequence is "often beneficial." *Id.*

16

while Plaintiff's allegation that Defendant violated SCDC's policy by failing to provide him with forty-eight hours notice of the ICC hearing does not in and of itself establish a constitutional violation, *see Jackson v. Sampson*, 536 F. App'x 356, 357–58 (4th Cir. 2013), the court finds it creates an triable issue of fact as to whether Plaintiff's right to be notified of the ICC hearing was clearly established. Accordingly, the court finds Defendant is not entitled to qualified immunity.

## IV. CONCLUSION

Because the court finds Plaintiff has a liberty interest in avoiding placement in security detention, and there are triable issues of fact as to whether Defendant is entitled to qualified immunity, the court **REJECTS** the Magistrate Judge's Report and Recommendation (ECF No. 51) and **DENIES** Defendant's Motion for Summary Judgment (ECF No. 22).

**IT IS SO ORDERED.**

*/s/ J. Michelle Childs*
United States District Judge

September 30, 2018
Columbia, South Carolina